John DOE, Appellant

v.

STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Appellee.

No. S–14310.

Supreme Court of Alaska.

Jan. 13, 2012.

Olena Kalytiak Davis, Anchorage, for appellant.

Megan R. Webb, Assistant Attorney General, Anchorage, and John J. Burns, Attorney General, Juneau, for appellee.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

CHRISTEN, Justice.

## I. INTRODUCTION

The Bethel Superior Court entered an order terminating an incarcerated father's parental rights to three of his five children. The father appeals, arguing that the superior court erred by finding that the State made active efforts to prevent the breakup of his

1. Pseudonyms have been used to protect the identities of the parties.

2. 25 U.S.C. §§ 1901–1923 (2006).

family and finding that it was in the children's best interests for his parental rights to be terminated. Because the superior court's active efforts and best interests findings were supported by the record and not clearly erroneous, we affirm the superior court's ruling terminating the father's parental rights.

## II. FACTS AND PROCEEDINGS

John and Jane Doe are the biological parents of five minor children: 16–year–old Preston, 14–year–old Adam, 11–year–old Trevor, ten-year-old Mathilda, and six-year-old Nin.[1] The family is Yup'ik, and the children are Indian children as defined by the Indian Child Welfare Act (ICWA).[2] Both John and Jane take pride in the Yup'ik culture; John wants his children to remain connected to the Yup'ik community.

### A. John's Criminal History, Alcohol Abuse, And Incarceration

John has a substantial criminal history. In 1985, he was convicted of second-degree murder and received an eighteen year sentence with ten years suspended. Between August 1998 and September 2000, John was convicted of disorderly conduct, assault in the fourth degree, driving while intoxicated, and indecent exposure. In 2001, John was convicted of domestic violence assault. In 2004, John was convicted of assaulting his wife, Jane, and was also convicted of misconduct involving weapons in the fourth degree. Around the same time in 2004, John was convicted of attempted sexual abuse of a minor in the third degree and was required to register as a sex offender; he was later arrested for failing to register.

In 2006, the Office of Children's Services (OCS) received reports indicating that John had physically and sexually abused his stepdaughter, Nellie, who was 14 years old at the time.[3] Nellie told OCS and the Alaska State Troopers that John had sexually abused her "more than ten times," starting when she was seven years of age. Nellie also stated

3. Nellie's case was separated from the other children's in 2007.

that she told Jane, her mother, about the abuse, but her mother did not call the police. John was subsequently convicted of sexual abuse of a minor in the second degree and sentenced to 12 years in prison, with four years suspended. John is currently serving that sentence; he is due to be released in 2014.

Around the time Nellie's allegations were being investigated, OCS conducted a safety assessment of the Doe home. A social worker interviewed the children, and both Nellie and Mathilda reported that John had physically abused them by hitting them on the back. In a later, unrelated contact with OCS, Jane stated that she had been repeatedly abused by John over the years. Jane stated that, on various occasions, John had pointed a gun at her head, choked her, hit her on the head, broken her ribs, and threatened to kill her.

John asserts that his trouble with the police has always been related to alcohol abuse. Many of his criminal sentences included the probationary condition that he refrain from possessing or consuming alcohol. John completed a roughly five-month-long alcohol treatment program at the Ernie Turner Center in Anchorage in 2001. John claims to have remained sober for "a couple years" following this treatment, but soon after completing the program, he was convicted of assault and ordered to report to the Bethel Alcohol Safety Action Program.[4] It appears that alcohol played a role in some of John's subsequent convictions as well.

## B. OCS Involvement With The Doe Family

From 1993–2002, OCS substantiated eight reports of neglect in the Doe home.[5] On October 12, 2002, Jane was arrested while intoxicated in a hotel room and placed in jail. John was apparently not available to care for the children and OCS was called to find a place for Trevor and Mathilda to sleep. The next morning, Jane was released, but she did not attempt to find her children. Instead, she returned to a bar to continue drinking. A relative later helped OCS reunite Jane with the children and OCS closed its inquiry after learning that Jane had a full-time job and did not drink daily. OCS received two additional reports that Jane was neglecting her children in late 2003 and early 2004; John may have been incarcerated at the time.[6] The children were temporarily placed in the home of a sober relative on each of these occasions.

In July 2004, Jane became highly intoxicated while she was taking care of Trevor. Jane was arrested and Trevor was placed in temporary care for the night. In September 2004, OCS received a report that Jane went on a drinking binge and left her children unsupervised for days. John may have been incarcerated or engaged in criminal proceedings when the July and September 2004 incidents occurred. In June 2006, a medical worker reported to OCS that Nin was being neglected by John and Jane.

Later in 2006, OCS received the report of John's physical and sexual abuse of Nellie. An OCS worker subsequently visited the Doe home and spoke with Jane. The worker and Jane developed a safety plan under which John would not be allowed to return to the home and Jane would not have alcohol in the home. John briefly returned to the home in January 2007, assaulted Jane, and was arrested. After Jane became intoxicated on consecutive nights that month, the children were temporarily taken to stay with relatives. Jane participated with OCS to update its safety plan after the January 2007 incidents, promising to refrain from drinking in the home and agreeing to undergo substance abuse and mental health assessments.

In February 2007, OCS was informed that Jane and two men were intoxicated in the

---

**4.** The record does not reveal whether John completed this ordered treatment.

**5.** The details of these incidents are not contained in the record.

**6.** In its trial brief, OCS asserted that John was incarcerated during each of a series of instances

in which Jane neglected the children. This assertion is not conclusively established by the record, although the fact that OCS was unable to place the children with John after removing them from Jane's custody suggests that he may have been incarcerated.

Doe home. OCS removed the children; later that night, Jane was sexually assaulted by one of the men in her home.

After the Doe children were removed from Jane's care, OCS workers created a case plan to provide for the safety of the children and the reunification of the Doe family. OCS discussed the plan with both John and Jane, and revised the plan twice between 2007 and 2008. John's case plan required him to "request parenting classes through the legal system," successfully complete alcohol treatment, and successfully complete sex offender treatment. John signed the case plan, indicating that he had read and understood it, and an OCS social worker met with him in jail to explain the plan and what it required him to do. John later testified that OCS workers largely neglected to explain the case plan after 2007, but one worker testified that OCS had again explained the case plan to John in a 2009 telephone call.

OCS facilitated in-person contact between Jane and the children on multiple occasions. OCS workers also helped Jane access multiple substance abuse treatment programs, mental health treatment, and parenting classes. One worker tried to help Jane procure stable housing.

OCS communicated with John by telephone during this period and John met with an OCS worker in person on one occasion. During 2007 and 2008, OCS enabled John to have roughly weekly telephone conversations with his children. John encouraged the children to read the Bible when he spoke to them. He also wrote them letters. After John was transferred to a new prison in late 2008, his telephone conversations with his children occurred less frequently, although OCS continued to facilitate these contacts. It appears that telephone conversations sometimes did not take place because an OCS worker was sick or leaving town. In other instances, the prison prevented John from making calls.

During this period, the Doe children were transferred among many different living arrangements. Preston moved between placements 14 times from February 2007 to March 2009; Adam was in nine different placements during the same period. OCS found relatives to take custody of some of the children at times, but these relative placements were short-lived. The relatives who took temporary custody of some the children included John's parents, John's cousin, Jane's sister, and other relatives of Jane. Some of the children severely misbehaved, and the relatives were uniformly unable or unwilling to assume custody for any extended period. OCS workers investigated other potential placements with John's relatives. An OCS worker contacted John's sister, but she declined to care for any of the children. John's daughter from another marriage was suggested as a potential placement, but an OCS worker did not have her contact information.[7] Other relatives failed background checks and were deemed unsuitable placements.

As of the termination trial in November 2010, the Doe children were housed in the following placements: (1) Preston was living in a foster placement in Napakiak; (2) Adam was living in the Pathway Boys Group Home in Anchorage; (3) Trevor had been recently removed from a long-term foster home and was living in a new foster placement; (4) Mathilda was living in a non-relative foster home where she had been housed since early 2009; and (5) Nin was living in a non-relative foster home where she had been housed since 2007.

Sometime after John was incarcerated for sexually abusing Nellie, Jane entered into a relationship with Olaf, a convicted sex offender. Later, the couple had a child. At the time of trial, Jane and Olaf lived together with their child, but Olaf did not want any of Jane's other children to live with them.

## C. Proceedings

OCS filed an emergency petition for adjudication of children in need of aid and for

---

**7.** At the termination trial, an OCS worker testified that she did not contact John's daughter, although the daughter was proposed as a potential placement for the Doe children. The worker testified that she "saw that [the daughter was proposed as a placement] on an e-mail, but I

didn't know the number so I did ask through e-mail what was her number but I didn't get a response back." From this testimony, it is unclear who failed to respond to the worker's request: members of the Doe family or other OCS staff.

temporary custody in February 2007. OCS was granted custody. In April 2007, both John and Jane stipulated that their children were in need of aid and agreed to allow OCS to take custody of the children for up to two years.

A permanency hearing was held in superior court in December 2007. The superior court approved OCS's plan to attempt to reunify the family, although it noted that neither parent had made substantial efforts to remedy their conduct. At a second permanency hearing held in December 2008, the superior court approved a plan to concurrently seek adoptive homes for the children and attempt to reunify them with their parents. In February 2009, OCS petitioned to extend its custody of the children for another year, and the superior court granted the petition. At the third permanency hearing, in November 2009, the superior court approved a permanent plan of adoption, finding that, despite OCS's active and reasonable efforts, it was not in the children's best interests to return to their parents' custody. The superior court instructed OCS to file a petition to terminate the parental rights of both parents and OCS filed a petition in March 2010.

A termination trial was held in November 2010 and January 2011. Representatives from the Yup'ik tribe and the village of Napakiak [8] were present at the trial. Six OCS workers testified regarding the agency's involvement with the Doe family over the years. John opposed the termination of his parental rights and testified on his own behalf. Jane opposed the termination of her parental rights but she did not testify.

John admitted that he was aware of his obligations under the case plan, and he expressed a desire to comply with the plan and remain in contact with his children. He testified that he spent a year taking care of Trevor in the early–2000s when Trevor was sick with pneumonia, and that he was sober and financially supporting the children during that period. And he testified that he completed a life skills/parenting class while incarcerated and requested a substance abuse evaluation from the Department of Corrections but received no response. According to John, he attempted to attend alcohol treatment early in his sentence, but that had been "difficult." It was uncontested that John was unable to participate in treatment programs at the time of the termination trial because he was segregated from the general prisoner population. John was placed in segregation because contraband was found in his cell. John testified that he wanted to participate in treatment programs, including sex offender treatment,[9] once his segregation ended.

On April 11, 2011, the superior court issued an order on the termination of John and Jane's parental rights. The superior court ruled that OCS proved by clear and convincing evidence that all five children were in need of aid under AS 47.10.011(1),[10] (2),[11] (8)(B)(i)-(ii),[12] (9),[13] (10).[14] The court also found that OCS proved by clear and convincing evidence that neither parent had remedied the conduct causing the children to be in need of aid.

The court then ruled that OCS demonstrated by clear and convincing evidence that it made active efforts to reunify the family.

---

**8.** John's parents apparently live in Napakiak; the Doe family also seems to have lived there intermittently.

**9.** In 2009, John stated that because he was appealing his sex offense conviction, he was unwilling to participate in sex offender treatment. But at the termination trial, John stated that he wanted to undergo sex offender treatment, though he denied that he was a "sex offender."

**10.** Subsection (1) of the statute pertains to abandonment.

**11.** Subsection (2) pertains to parents' absence and incarceration.

**12.** Subsection (8)(B) pertains to prospective mental injury to the child.

**13.** Subsection (9) pertains to neglect.

**14.** Subsection (10) pertains to parental substance abuse. The superior court also ruled that the female children—but not the male children— were in need of aid under AS 47.10.011(7), which relates to sexual abuse. Finally, the court ruled that Preston, Adam, and Mathilda were in need of aid under AS 47.10.011(8)(A), which relates to actual mental injury suffered by children.

The superior court's active efforts analysis centered on a discussion of OCS's interactions with Jane. The superior court found that OCS: developed "many case plans" for Jane; "provided [Jane] with support to work her case plan"; expended "[e]xtensive efforts and time ... just trying to locate [Jane]"; attempted to place Jane in substance abuse treatment; and "provided phone cards and visitation between [Jane] and her children." The superior court also found that there were "some concerning gaps in active efforts between July 2009 and January 2010," noting that OCS "could not explain why there were no documented contacts with [Jane] during that timeframe." But in consideration of OCS's overall involvement in the case and Jane's lack of desire to have her children back, the court ultimately found that active efforts had been established by clear and convincing evidence.

The superior court found that OCS properly focused its reunification efforts on Jane, given John's incarceration. The court also identified several steps OCS had taken to promote reunification and provide rehabilitative services to John. It noted that OCS had encouraged John "to take parenting classes and obtain substance abuse treatment," involved John in case plan reviews, and "provided visitation between [John] and his children." The court concluded that "[b]ased on his maximum security status [John] created little opportunity for the State to do much more than encourage him and ensure he had visits with his children. The State did this."

The court also found that OCS made active efforts to "assist the children with foster homes, residential treatment, and counseling" and noted that "[s]ocial workers visited with the children regularly," and OCS made "extensive efforts to ensure the siblings visited with each other." Additionally, the superior court found that OCS "made excellent efforts to locate relative placements and continues to do so.... These efforts also go toward reunifying the family."

The court ruled that OCS proved, beyond a reasonable doubt, that continued custody of the children by either parent was likely to result in serious emotional or physical damage to the children. Finally, the court found, by a preponderance of the evidence, that the termination of John and Jane's parental rights to Trevor, Mathilda, and Nin was in the children's best interests. The court entered a judgment terminating the parents' rights to the three younger children, focusing on the children's need for permanency:

> These children are young, and have been in State custody for four years. Their mother cannot have them in her home. Their father will be off probation in 2019. At that time, [Trevor] will be age 19[,] [Mathilda] will be age 20, and [Nin] will be age 14.[15] There is an urgent need for permanency for these children. Terminating these parental rights is necessary to achieve a permanent home for them.

The court found that it was not in the best interests of Preston or Adam to terminate John and Jane's parental rights because there was no evidence of the older boys' feelings about termination. John appeals the termination of his parental rights to Trevor, Mathilda, and Nin. Jane did not appeal the superior court judgment.

### III. STANDARD OF REVIEW

▮▮▮▮ "In a case involving the termination of parental rights, we review a superior court's findings of fact for clear error."[16] "Findings are clearly erroneous if, after reviewing the record in the light most favorable to the prevailing party, we are left with a 'definite and firm conviction that a mistake has been made.'"[17] Best interest determinations are factual findings reviewed under a clearly erroneous standard.[18] The sufficien-

---

**15.** During his five-year probationary period, John will be unable to have children under the age of 16 living in his household. Contrary to the superior court's findings, Mathilda will be 16 years of age by 2017 and 18 years of age by 2019. It appears she would be permitted to live with John in 2017 under the terms of his probation.

**16.** *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 175 P.3d 1263, 1267 (Alaska 2008).

**17.** *Id.* (quoting *A.B. v. State, Dep't of Health & Soc. Servs.,* 7 P.3d 946, 950 (Alaska 2000)).

**18.** *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 254 P.3d 1095, 1104 (Alaska 2011).

cy of the state's "active efforts" under ICWA presents a mixed question of law and fact; we review questions of law de novo.[19]

## IV. DISCUSSION

### A. The Superior Court Did Not Err In Finding That OCS Engaged In Active Efforts To Reunify The Doe Family.

██ John argues that the superior court erred in finding, by clear and convincing evidence, that OCS made active efforts to "provide remedial services to John and keep Trevor[,] Mathilda, and Nin in their Native family." John focuses on two alleged deficiencies in OCS's efforts: (1) OCS workers' lack of contact with him during his incarceration; and (2) OCS's failure to attempt to find placements for the children with "all living adult family members" of the Doe family.

John argues that "ICWA has no exception for incarceration[ ] and requires active efforts even when a parent is incarcerated." He contends that "no such effort was made on [his] behalf," arguing that OCS workers had "a shamefully small amount of contact with him." OCS responds that the sum of its contacts with the Doe family demonstrates that it made active efforts to prevent the breakup of the family. OCS highlights John's incarceration as a factor relevant to the sufficiency of its efforts, and notes that it had some discretion in determining what efforts to pursue. OCS then discusses its extensive history of involvement with the Doe family, including its "concerted efforts to ensure the children could remain safely in their mother's care[ ] while their father was incarcerated." OCS also identifies its efforts in relation to John, noting that workers visited John in jail, explained his case plan to him, and enabled him to have telephone contact with his children.

OCS acknowledges that social workers appear to "have had minimal contact" with John after he was transferred to a new prison in late–2008, and concedes that "additional social worker contact with John may have been preferable." But OCS argues that additional contact "would not have altered the situation in any substantive respect. John would still have been incarcerated, in segregation, and unable to engage in any services. . . ." OCS argues that, in any case, the superior court "was also entitled to consider OCS's efforts with respect to Jane," and that these efforts were "consistent and extensive." Finally, OCS argues that its failure to find relative placements for some of the children is irrelevant to the active efforts analysis. In the alternative, OCS argues that it made active efforts to place the Doe children with relatives.

██ Before parental rights may be terminated under ICWA, that statute and the CINA Rules require proof by "clear and convincing evidence" that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[20] We evaluate whether the active efforts requirement has been satisfied on a case-by-case basis;[21] generally, "active efforts require that the [S]tate actually help the parent develop the skills required to keep custody of the children," rather than merely develop a case plan for the parent to follow.[22] In evaluating whether the State has met this burden, "we look to the State's involvement in its entirety."[23]

██ We have held that "[n]either incarceration nor doubtful prospects for rehabilitation will relieve the State of its duty under ICWA to make active remedial efforts."[24]

**19.** *Id.*

**20.** 25 U.S.C. § 1912(d) (2011); CINA Rule 18(c)(2)(B).

**21.** *A.A. v. State, Dep't of Family & Youth Servs.,* 982 P.2d 256, 261 (Alaska 1999) (citing *A.M. v. State,* 945 P.2d 296, 306 n. 12 (Alaska 1997)).

**22.** *Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 222 P.3d 841, 849 (Alaska 2009).

**23.** *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 212 P.3d 756, 763–64 (Alaska 2009) (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 175 P.3d 1263, 1268–69 (Alaska 2008)).

**24.** *A.M. v. State,* 891 P.2d 815, 827 (Alaska 1995).

But "circumstances surrounding a parent's incarceration," including "the duration of a parent's incarceration and the services possible for incarcerated parents" can have a "direct bearing on what active remedial efforts are possible."[25] When a parent is incarcerated, the superior court may consider, in addition to efforts made by OCS, remedial programs offered by the Department of Corrections.[26] OCS's interactions with the non-incarcerated parent may be considered an "important aspect of the [S]tate's active efforts to keep the family together."[27]

The superior court considered "the State's involvement in its entirety"[28] to find that the active efforts requirement was satisfied. The court focused on OCS's efforts toward Jane, finding that OCS wrote a letter to help Jane get housing, provided telephone cards and visitation between Jane and the children, and actively encouraged Jane to seek treatment and stay in close contact with her children. The court also found that Jane completed two treatment programs and that OCS set up substance abuse aftercare in her village, but that Jane "disappeared." These findings were supported by the record, which documents numerous instances in which OCS referred Jane to treatment, enabled her to have contact with the children, and provided her with other remedial services. The superior court did not err by focusing on these undertakings as the foundation of its active efforts determination; the court found that OCS fulfilled its statutory duty by attempting to actually help Jane develop the skills required to keep custody of the children,[29] and this finding is supported by the record.

OCS's alleged failure to contact Jane for a six-month period does not change this analysis. As the superior court correctly noted, the question of whether the State made active efforts must be evaluated "throughout the case."[30] Additionally, it appears that OCS actually *did* have contact with Jane during the six-month period. The superior court's understanding that "there were no documented contacts with [Jane]" from July 2009 to January 2010 was based on an OCS worker's inability to remember documented contacts during that period under cross-examination. But the documentary evidence showed that, in November 2009, the worker referred Jane to behavioral services and made travel arrangements to allow her to access those services. OCS's history of contact with Jane, considered in its entirety, is clear and convincing evidence of the agency's active efforts to provide her with remedial services and reunite her with the children.[31] These efforts are also relevant to OCS's efforts to assist John. As our court explained in *Dashiell R. v. State*, OCS's active efforts toward a non-incarcerated parent are important because if the children are able to stay with the non-incarcerated parent, it is unlikely the incarcerated parent's rights will be terminated.[32]

John does not dispute the extent of OCS's efforts toward Jane; instead, John argues that OCS had a "shamefully small amount of contact with him" and that, as a result, OCS failed to make active efforts to reunify him with his children or provide rehabilitative services. John is correct that "ICWA has no exception for incarceration," but he neglects to acknowledge that his incarceration "significantly affects the scope of the active efforts that the State must make to satisfy the statutory requirement."[33] OCS's efforts easily satisfied this narrower requirement.

**25.** *Dashiell R.*, 222 P.3d at 849 (quoting *A.M.*, 891 P.2d at 827).

**26.** *Id.*

**27.** *Id.* at 850.

**28.** *Jon S.*, 212 P.3d at 763–64.

**29.** *Dashiell R.*, 222 P.3d at 849.

**30.** *See Jon S.*, 212 P.3d at 763–64 (holding that active efforts determination depends on "the state's involvement in its entirety").

**31.** *See, e.g. E.A. v. State, Div. of Fam. & Youth Servs.*, 46 P.3d 986, 991 (Alaska 2002) (holding that State's failure to make active efforts over seven-month period was insignificant in light of extensive remedial efforts during remainder of case).

**32.** *Dashiell R.*, 222 P.3d at 850.

**33.** *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999).

From the outset of his incarceration in 2007 to late–2008, OCS spoke with John frequently by telephone and visited him in person once. During this period, OCS enabled John to have roughly weekly telephone conversations with his children. Although these telephone contacts occurred less frequently after John was transferred in late–2008, the infrequency was partially related to the difficulties of making telephone calls to him in prison. The record supports the finding that OCS actively promoted the Doe family's reunification by facilitating John's continued interaction with his children.

OCS also helped John access remedial services to the extent it was capable of doing so. OCS explained John's case plan to him in person after he was incarcerated, and explained the plan again by telephone in 2009. John admitted that he was aware of his obligations under the plan throughout his incarceration. While housed in the general prison population—where he was eligible to receive treatment services—John completed a life skills class, and attempted substance abuse treatment but did not complete it because "it was difficult." In 2009, John was unwilling to participate in sex offender treatment; at trial, he expressed a willingness to attend sex offender treatment even though he was appealing his conviction and did not consider himself to be a sex offender. But John's misconduct in prison made him ineligible to receive any treatment until mid-to-late 2011. DOC's treatment offerings can satisfy OCS's remedial obligations to incarcerated parents,[34] and if not for his own misconduct, John would have remained eligible for these programs. But John was reluctant or unwilling to participate even when eligible for remedial services in prison, and his recalcitrance further limited OCS's active efforts obligation.[35]

Finally, John argues that the superior court erred in finding that OCS made "excellent efforts" to find relative placements for the children. OCS counters that "the question of whether OCS was diligent in locating adult family members . . . willing to care for children in its custody is not relevant to the question of whether OCS made active efforts."

In *David S. v. State, Department of Health & Social Services, Office of Children's Services*, we recognized that, under limited circumstances, "a child's placement might affect a parent's ability to participate in remedial efforts" and might therefore be relevant to the active efforts analysis.[36] But we explained that "ordinarily the question whether a placement decision complies with ICWA's placement preferences will not be germane to the elements of termination."[37] In this case, OCS's placement efforts were not germane to its active efforts; John made no showing that the placement of the children had any bearing on his ability to participate in remedial efforts. Further, because it did not have guidance from our since-issued decision in *David S.*, the trial court considered OCS's placement efforts as a part of its active efforts analysis and found that OCS made "excellent efforts to locate relative placements." These findings were not clearly erroneous.

OCS contacted John's sister, but she refused to take custody of the children. OCS succeeded at placing the children, temporarily, with John's aunt, John's parents, and some of Jane's relatives. These relatives were uniformly unable or unwilling to care for the children for any extended period. Other relatives failed background checks and were deemed unsuitable placements. Although the record leaves open the possibilities that OCS did not follow through on contacting John's daughter[38] or brother, this uncertainty does not cause us to disregard OCS's otherwise extensive relative search.

OCS developed a case plan, explained it twice, enabled John to remain in touch with his children, and attempted to secure relative

---

**34.** *A.A.*, 982 P.2d at 263.

**35.** *See, e.g., N.A. v. State*, 19 P.3d 597, 603 (Alaska 2001) (holding "parent's demonstrated lack of willingness to participate in treatment" may be considered in determining whether the State has made active efforts).

**36.** 270 P.3d 767, 779 (Alaska 2012).

**37.** *Id.*

**38.** *See supra* note 7.

placements for the children. We agree with the superior court that OCS had "little opportunity ... to do much more than encourage [John] and ensure he had visits with his children." These measures, in conjunction with OCS's considerable efforts to help Jane, demonstrate that OCS actively attempted to prevent the breakup of the Doe family.

**B. The Superior Court Did Not Commit Clear Error By Finding That The Termination Of John's Parental Rights Was In His Children's Best Interests.**

John argues that the superior court clearly erred by finding that the termination of his parental rights was in the best interests of his three youngest children. John notes that the superior court did not terminate his parental rights to his oldest sons and argues that this "clearly casts doubt regarding the termination of John's rights to Trevor, who is only three years younger than Adam." John also contends that the superior court "failed to consider [John's] strong determination to continue in his relationship with all his children, which it was obligated to do." Finally, John argues that the superior court "ignor[ed] ICWA's very important overarching best interests standard that the children should remain either with their extended family or inside the tribe." John concludes that the superior court "simply did not have enough evidence" to terminate his parental rights.

OCS responds that the superior court's reasons for preserving John's parental rights to his oldest sons were not transferable to the younger children and argues that the superior court properly focused on the younger children's need for permanency because "if termination were denied, the children could very well remain in OCS custody for over a decade." OCS notes that Nin is housed in a pre-adoptive placement and argues that while Trevor and Mathilda are not currently in pre-adoptive placements, this "does not preclude the court from finding

that termination of parental rights is in the children's best interest." OCS also disputes John's claim regarding ICWA's "overarching best interests standard," arguing that ICWA's placement preferences are "irrelevant to the question ... of whether termination of parental rights is in a child's best interests."

To prevail in a proceeding seeking the termination of parental rights, OCS must prove "by a preponderance of the evidence that termination of parental rights is in the best interests of the child."[39] A superior court may consider "any fact relating to the best interests of the child" in its best interests analysis.[40] A superior court's best interests determinations are findings of fact, which we review under the "clearly erroneous" standard.[41]

**1. The superior court's decision to terminate John's parental rights to some, but not all, of the children does not suggest clear error.**

John argues that it was clear error for the superior court to terminate his parental rights to Trevor, Mathilda, and Nin while preserving his parental rights to Preston and Adam. But the superior court's distinction between the older boys and their younger siblings was adequately supported by the record.

OCS's purpose in seeking the termination of parental rights was to free the children for adoption;[42] from the record, it appears that neither Preston nor Adam was likely to be adopted. Preston was 16 at the time of trial and he was transferred between many different placements after OCS took custody. Preston experienced significant challenges: he was hospitalized for psychiatric problems, he was detained for allegedly molesting a young girl, and he experienced conflict with caregivers. Adam, who was 14 at the time of trial, had been similarly unable to remain in placements for long and had psychiatric issues. Based on these factors, the termination of John's parental rights would likely

---

**39.** CINA Rule 18(c)(3); *see also* AS 47.10.088(c).

**40.** AS 47.10.088(b).

**41.** *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1104 (Alaska 2011).

**42.** AS 47.10.088(a).

have had little tangible effect on achieving permanency for the two boys. In contrast, Trevor, Mathilda, and Nin had better chances, by virtue of their ages and histories, of finding permanent placements in adoptive homes.[43] John's argument that it was illogical to terminate his rights to the younger children while preserving his rights to Preston and Adam is unpersuasive.

## 2. The superior court did not commit clear error by terminating John's rights to Trevor and Mathilda despite the children's lack of pre-adoptive placements.

John also argues that because Trevor and Mathilda were not housed in pre-adoptive placements at the time of the trial, the termination of John's parental rights was not in their best interests. We have considered the effect a child's lack of pre-adoptive placement has on the best interests determination in several cases. The general rule that emerges from these cases is accurately summarized by OCS in its brief: "While the lack of a pre-adoptive placement for Trevor and Mathilda may be relevant to a best-interests finding, it does not preclude the court from finding that termination of parental rights is in the children's best interest[s]." In *Karrie B. v. Catherine J.*, we determined, as a matter of law, that the lack of a pre-adoptive placement could be relevant to the best interests analysis.[44] But in *Carl N. v. State, Department of Health & Social Services*, we affirmed the termination of a father's parental rights despite the lack of a pre-adoptive placement, observing that the child's temporary foster placement had agreed to retain custody until the child reached 18.[45] Similarly, in *G.C. v. State, Department of Health & Social Services, Division of Family & Youth Services*, we affirmed the termination of a father's parental rights although his child was not in pre-adoptive placement at the time.[46]

Here, OCS's lack of success in finding pre-adoptive placements for Trevor and Mathilda is troubling, but it does not follow that it is in the children's best interests for John to retain his parental rights. The superior court found that the children were young, had already been in state custody for four years, and had "an urgent need for permanency." The court further noted that Jane had moved in with another man and was unwilling to house the children, while John would be unable to provide a home for most of them until at least 2019.[47] These findings are amply supported by the record: (1) John's incarceration and probation will extend until 2019; (2) at the time of trial, Jane was living with a sex offender who did not want Jane's children to reside with them; and (3) Jane had stopped attending visitation with the younger children by the end of trial.

Although OCS had not identified pre-adoptive placements for Trevor and Mathilda by the time of trial, the termination of John's and Jane's parental rights triggered the agency's legal duty to find adoptive placements for the children.[48] It was not clear error for the superior court to find that it was in the children's best interests to have the opportunity to be adopted rather than live in temporary custody for, at a minimum, several more years.

## 3. The superior court did not commit clear error by failing to explicitly consider John's desire to continue his relationship with the children.

John also contends that the superior court "failed to consider John's strong determina-

---

43. John argues that the superior court had no reason to distinguish Trevor's best interests from Adam's, given that Trevor was "only three years younger than Adam," and that "John has a special relationship with Trevor." But there are significant developmental differences between an 11–year–old boy and a 14–year–old boy, and it is reasonable to assume that Trevor had a better chance of finding an adoptive placement. The fact that John cared for Trevor when the boy had pneumonia in 2000 does not change this calculus; the superior court's distinction between Trevor and Adam was not clear error.

44. 181 P.3d 177, 185 (Alaska 2008).

45. 102 P.3d 932, 937 (Alaska 2004).

46. 67 P.3d 648, 655 (Alaska 2003).

47. The superior court's finding in this regard was inaccurate; John would technically be permitted to house Mathilda starting in 2017. *See supra* note 15. But this small error has no bearing on the overall accuracy of the trial court's findings.

48. AS 47.10.088(i).

tion to continue in his relationship with all his children, which it was obligated to do." As proof of his determination, John notes that he spoke with his children on the telephone frequently during his incarceration. In its best interests analysis, the superior court did not specifically mention John's desire to maintain a relationship with his children.

We can find no support in the law for the proposition that a superior court is obligated to enter findings articulating its consideration of a parent's desire to continue parenting his children as a component of its best interests analysis. One of the statutory factors *relevant* to the best interests determination is "the amount of effort by the parent to remedy the conduct or the conditions in the home"; [49] John apparently relies on this factor for his assertion that the superior court "was obligated" to consider his telephone communications with the children.[50] But the factors outlined in AS 47.10.088 are non-exclusive, and there is no requirement that superior courts "accord a particular weight to any given factor." [51] All of the statutory factors—including the amount of remedial effort expended by John—indicate that the termination of John's parental rights was in the best interests of his children. Further, the 'record makes it clear that the superior court was well aware of John's desire to parent his children; John testified at length in opposition to OCS's petition.

**4. The superior court was not required to consider ICWA's placement preferences as a component of its best interests analysis.**

John further argues that the superior court erred in its best interests analysis by failing to account for ICWA's placement preferences. He asserts that the superior court:

did not address the children's need for sibling contact, as well as contact with their extended family and tribe, as such, ignoring ICWA's very important overarching best interests standard that the children should remain either with their extended family or inside the tribe. Given the impossibility of finding any adoptive home that could keep the children together, maintaining their identity and connection through their father is very important and should have been given thought and weight in the analysis.

In support of this argument, John identifies an Arizona case stating that "[ICWA] is based on the fundamental assumption that it is in the Indian child's best interests that its relationship to the tribe be protected." [52] He argues that ICWA is therefore "inarguably part of the best interests analysis of any Alaska [N]ative child."

OCS argues that John fails to support the foregoing argument with "any legal authority or provision ... most likely because there isn't any." OCS argues that "ICWA does not ... require a determination that termination is in the child's best interest—a requirement established solely under state law." OCS concludes by citing to a memorandum opinion of this court for the proposition that ICWA's placement preferences are "irrelevant to the question, under state law, of whether termination of parental rights is in a child's best interests."

In *Jacob W. v. State* (an unpublished memorandum opinion), we rejected the appellant's argument that the superior court erred by failing to consider ICWA's placement preferences as a component of its best interests analysis. We wrote:

In placing an Indian child in foster care or an adoptive home, ICWA requires that preference be given ... to members of the child's extended family or to someone oth-

---

**49.** AS 47.10.088(b)(2).

**50.** John cites *Barbara P. v. State*, 234 P.3d 1245, 1263–64 (Alaska 2010) for his assertion that the superior court failed to comply with a legal obligation. *Barbara P.* is actually adverse authority for John. In that case, we held that despite the parents' professed "determination to change," the superior court did not err in finding that termination was in the children's best interests

because it was entitled to give weight to the children's need for permanency. *Id.*

**51.** *Id.* at 1263.

**52.** *Matter of Appeal in Pima Cnty. Juvenile Action No. S–903*, 130 Ariz. 202, 635 P.2d 187, 189 (Ariz.App.1981).

erwise affiliated with the child's Indian tribe. But this specifically applies to placement of an Indian child; nothing in ICWA requires consideration of placement options in determining whether to terminate parental rights. The relevant issue was whether ... parental rights should be terminated in the best interests of the children, not what would happen to the children after termination of those parental rights.[53]

In *Lucy J. v. State, Department of Health & Social Services, Office of Children's Services*, we held that ICWA's placement preferences are not a part of the best interests inquiry in a termination proceeding.[54] We see no reason to disregard this precedent here.[55]

## V. CONCLUSION

For the foregoing reasons, we AFFIRM the superior court's order terminating John's parental rights to Trevor, Mathilda, and Nin.

---

**53.** *Jacob W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 2008 WL 5101809 at *9 (Alaska, Dec. 3, 2008).

**54.** 244 P.3d 1099, 1120 (Alaska 2010).

**55.** The superior court also observed that OCS *did* try to find relative placements. In its active efforts findings, the court determined that OCS "made excellent efforts to locate relative placements and continues to do so." This finding was supported by the record.