NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| DAMON W., | ) | |
| | ) | Supreme Court No. S-16739 |
| Appellant, | ) | |
| | ) | Superior Court Nos. 3KN-15-00027 CN |
| v. | ) | 3KN-16-00085 CN |
| | ) | |
| STATE OF ALASKA, | ) | MEMORANDUM OPINION |
| DEPARTMENT OF HEALTH & | ) | AND JUDGMENT* |
| SOCIAL SERVICES, OFFICE | ) | |
| OF CHILDREN'S SERVICES, | ) | No. 1668– March 14, 2018 |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kenai, Anna Moran, Judge.

Appearances: Carolyn Perkins, Law Office of Carolyn Perkins, Salt Lake City, Utah, for Appellant. Shelley J. White, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

## I. INTRODUCTION

The superior court terminated a father's parental rights to his two children. The father appeals, challenging the superior court's finding that the Office of Children's Services (OCS) made the required active efforts to prevent the breakup of his family.

---

\*       Entered under Alaska Appellate Rule 214.

We conclude that the court's finding of active efforts is supported by the evidence and not clearly erroneous. We therefore affirm the termination order.

## II. FACTS AND PROCEEDINGS

Damon and Kelly[1] are the parents of Ian, born in June 2015, and Janelle, born in November 2016. When Ian was born, Damon and Kelly were living at the Mission, a private residence near Soldotna operated by the Calvary Life Fellowship for the purpose of "taking in people [who are] needy." Damon and Kelly lived at the Mission episodically — "as many as 12 or 15 times" over the course of three years, with intermittent periods of homelessness.

A few days after Ian's birth, OCS received a report that Damon and Kelly had left him unattended at the Mission following an argument. OCS filed an emergency petition for temporary custody. The petition relied not only on the recent incident of neglect; it also related OCS's history with the parents going back to 2012, including assertions that Kelly had used methamphetamine and heroin while pregnant with other children; that she and Damon continued to drink to excess and to use spice, methamphetamine, and marijuana; that Damon had injured Kelly in several incidents of domestic violence; that both had been incarcerated at various times for assault, disorderly conduct, theft, and other offenses; and that two older children had been placed in guardianships with relatives. OCS was granted temporary custody of Ian pending a disposition hearing, and in December 2015 Ian was adjudicated a child in need of aid under AS 47.10.011(1) (abandonment), (6) (substantial risk of physical harm), (9) (neglect), and (10) ( parental substance abuse).

---

[1] We use pseudonyms to protect the parties' privacy.

OCS caseworker Fran Martin was assigned Ian's case. She later testified that she attempted repeatedly to speak with Damon and Kelly about their case when it was first opened, but they were hard to find and largely unresponsive. In July 2015 Martin created a case plan with the primary goal of reunifying Damon and Kelly with Ian. The case plan listed the same four goals for both parents: (1) "maintain[ing] a sober and safe lifestyle in order to be a protective and calm parent"; (2) gaining the necessary parental skills by "attending parenting sessions and showing behavior changes"; (3) "maintain[ing] a stable home that is free of safety risks" to parents and children; and (4) "resolv[ing] conflict in a calm and respectful manner." Damon and Kelly eventually met with Martin and signed the case plan. But they refused the services OCS recommended, telling Martin they were already receiving services through Dena'ina Wellness Center — though they refused to sign releases that would allow Martin to confirm this.

Martin continued to have trouble contacting Damon and Kelly to talk about their progress. When she learned that the couple had left the Mission and were homeless, she made efforts to find them, checking several homeless camps and trying to catch them before or after scheduled visitations. In early December 2015 she learned that Damon and Kelly would be attending a court hearing; she contacted them at the courthouse. She set up a visitation with Ian for the following day, but Damon and Kelly failed to attend it.

In late 2015 Damon and Kelly moved away to live on a farm owned by the Calvary Life Fellowship in Michigan's rural Upper Peninsula. OCS considered implementing the Interstate Compact on Placement of Children[2] (ICPC), but it delayed initiating the process because Damon and Kelly's "living arrangements . . . weren't

---

[2]     *See* AS 47.70.010-.080.

stable" and there was some uncertainty whether the couple were in Michigan for the long term.[3] Martin left OCS in March 2016 and Damon and Kelly were assigned new caseworkers, Lisa Kowalkowski and Hans Klodt. Klodt contacted Michigan Child Protective Services, but he testified that after learning that the nearest town with limited services was 55 miles from the Calvary Life Fellowship's farm, OCS did not give further consideration to services there.

Damon and Kelly moved back to Alaska in May 2016 after receiving notice that the goal of their case plan had been changed from reunification to adoption. Again they lived at the Mission, at least initially. Within days of moving back, they met with OCS caseworkers Kowalkowski and Klodt and expressed their willingness to engage in their case plan. OCS updated the case plan with the same primary goals, though noting that the parents had so far made no or minimal progress. OCS arranged for hair follicle drug tests, random urinalysis testing (UAs), an integrated substance abuse and mental health assessment, and a substance abuse assessment. Kowalkowski helped the parents apply for public assistance and transportation assistance and gave them transportation vouchers. She did not address housing issues at the time because "[t]hey had a place to live" at the Mission.

Damon and Kelly made some effort to comply with the case plan. Both completed their assessments, but neither followed through with treatment recommendations. Damon began outpatient treatment but left after a week of attendance. OCS attempted to place him in residential treatment, but he was discharged for lack of participation. He followed through on UAs only intermittently.

---

[3] Martin testified that an ICPC submission was also delayed because of concerns that it would be denied and "then it would be even more difficult to get a ICPC granted later."

In September 2016 OCS petitioned to terminate both Damon's and Kelly's parental rights to Ian. Within six weeks of the petition Damon tested positive for amphetamine. In a follow-up substance abuse assessment in November, he admitted to using methamphetamine two to three times a week. The result of the assessment was another recommendation for residential treatment, but Damon apparently failed to apply for admission to the program.

Janelle was born in November 2016; she was taken immediately into OCS custody because of her exposure in utero to methamphetamine and amphetamine. Kowalkowski met with Damon and Kelly a month later to arrange visitation and other services, and visitations with both Ian and Janelle continued sporadically. Kowalkowski assisted Kelly with her application for residential treatment, but Kelly did not enter treatment because she was facing criminal charges that ultimately led to her incarceration. Neither Damon nor Kelly engaged in treatment after Janelle's birth. On January 31, 2017, OCS filed a petition to terminate their parental rights to Janelle.

The superior court held a termination trial in March 2017. Whether the children were Indian children as defined by the Indian Child Welfare Act (ICWA) was unclear, and OCS elected to proceed as though ICWA applied. After hearing the evidence the court determined that Ian and Janelle were children in need of aid under AS 47.10.011 subsections (1) (abandonment), (9) (neglect), and (10) (substance abuse). Kelly voluntarily relinquished her parental rights to Ian; in a written order, the superior court terminated her rights to Janelle and Damon's rights to both children.

Damon appeals, challenging only the superior court's finding that OCS made active efforts to prevent the breakup of the family.

## III. STANDARDS OF REVIEW

Whether OCS complied with ICWA's "active efforts" requirement is a mixed question of law and fact.[4]  We review questions of law de novo[5] and factual findings for clear error.[6]  "Findings are clearly erroneous if, after reviewing the record in the light most favorable to the prevailing party, we are left with 'a definite and firm conviction that a mistake has been made.' "[7]  "Conflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[8]

## IV. DISCUSSION

The superior court made the findings necessary for termination of a parent's rights to an Indian child:[9]  that Ian and Janelle were children in need of aid; that Damon and Kelly failed to remedy, within a reasonable time, the conduct that caused their children to be in need of aid; that active efforts were made to avoid the breakup of the family; that the children would be at risk of harm if returned to their parents; and that termination of parental rights was in the best interests of the children.  Damon appeals

---

[4]    *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008) (citing *T.F. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 26 P.3d 1089, 1092 (Alaska 2001)).

[5]    *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1104 (Alaska 2011) (citing *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1018 (Alaska 2009)).

[6]    *Id.* at 1103 (citing *Maisy W.*, 175 P.3d at 1267).

[7]    *Maisy W.*, 175 P.3d at 1267 (quoting *Brynna B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 88 P.3d 527, 529 (Alaska 2004)).

[8]    *Id.*  (footnote omitted).

[9]    *See* CINA Rule 18(c).

only the superior court's finding that OCS made active efforts, focusing on two alleged deficiencies: (1) OCS's lack of efforts while he was living in Michigan, and (2) OCS's failure to help with housing once he and Kelly returned to Kenai.

"In a termination proceeding involving Indian children, the superior court must find, by clear and convincing evidence, that the State has made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that those efforts were unsuccessful."[10] "We have held that no pat formula exists for distinguishing between active and passive efforts and have adopted a case-by-case approach for the active efforts analysis."[11] "Generally, 'OCS makes active efforts . . . when it helps the parents develop the resources necessary to satisfy their case plans, but its efforts are passive when it requires the parents to perform these tasks on their own.' "[12] Whether OCS made active efforts is based on the entirety of its involvement in the case.[13]

Damon focuses first on the time he and Kelly were living in Michigan. The superior court agreed that "nothing was done [by OCS] for [those] four to five months"

---

[10] *Denny M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 365 P.3d 345, 350 (Alaska 2016) (quoting *Philip J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 314 P.3d 518, 527 (Alaska 2013)); *accord* 25 U.S.C. § 1912(d) (2016).

[11] *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 271 (Alaska 2011) (quoting *Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 235 P.3d 203, 213 (Alaska 2010)).

[12] *Denny M.*, 365 P.3d at 350 (alteration in original) (quoting *Sylvia L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 343 P.3d 425, 432 (Alaska 2015)).

[13] *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1108 (Alaska 2011) (citing *Maisy W.*, 175 P.3d at 1268-69).

except some internal deliberation about whether to implement the ICPC process for child placement out of state. Although the superior court noted that "OCS could have done more in locating and determining what services were available to [the parents] in Michigan," it ultimately concluded that "[w]hen measured over the life of the case, . . . OCS repeatedly attempted to provide active efforts for rehabilitation" and to engage the parents in services.

We have held that "periods of inactivity are not fatal to a finding of active efforts where OCS's participation has been active 'in its entirety.' "[14] In *Maisy W.*, for example, we upheld a finding of active efforts despite a three-month period of inactivity, given that OCS created and updated case plans, arranged visitations, made referrals for assessments, arranged and offered transportation, carried out home visits, coordinated services, and offered assistance with housing.[15] The record in this case is similar.

The superior court found that OCS's active efforts began "with [Ian's] placement into OCS's temporary custody." OCS created a case plan and set up visitation with Ian. Martin then engaged in "extensive efforts trying to contact [Damon and Kelly] so she could meet with them and have them sign [the] case plan." The superior court noted the scope of Martin's efforts: she "repeatedly went to the area where they had been reported to be camping"; "[she] frequently stopped by the Holiday station near [their] camping area," where she knew they sometimes bought food, and gave a Holiday employee her card to give to Damon and Kelly; and when she learned from Damon's

---

[14] *Id.* at 1109 (quoting *Maisy W.*, 175 P.3d at 1268); *e.g.*, *Doe v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 272 P.3d 1014, 1021 (Alaska 2012) (no OCS effort for six months); *Roland L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 206 P.3d 453, 456-57 (Alaska 2009) (no OCS effort for three months); *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 990-91 (Alaska 2002) (no OCS effort for seven months).

[15] *Maisy W.*, 175 P.3d at 1269.

mother that he would be attending a court hearing in an unrelated matter, she met Damon and Kelly at the courthouse and used the occasion to set up a visitation with Ian.

The superior court further found that after Damon and Kelly moved back from Michigan, "OCS worker Hans Klodt helped [them] get into services." The record reflects that OCS arranged hair follicle tests, random UAs, an integrated mental health and substance abuse assessment, a substance abuse assessment, and visitation with Ian and Janelle; it assisted Damon and Kelly with applications for public assistance and transportation assistance; and it provided transportation vouchers.

The superior court also appropriately considered the extent of Damon's cooperation. We have acknowledged that a court "may consider 'a parent's demonstrated lack of willingness to participate in treatment.' "[16] The superior court in this case noted that Damon and Kelly actively avoided contact with the OCS caseworkers at the outset of OCS's involvement. The evidence supports this finding. Martin testified that she repeatedly attempted to contact Damon and Kelly, without success. When she finally did make contact, the parents "flatly rejected Ms. Martin's offer to set up services for them, stating they were already receiving services . . . [but] refused to sign releases of information so Ms. Martin could confirm services." Then "[a]fter [Janelle] was born, [the parents] repeated the pattern of avoiding [OCS] caseworker Lisa Kowalkowski, who was trying to set up services for them." The superior court also noted that "neither parent completed any part of their case plan." It was nearly a year after Ian was taken into custody that Damon and Kelly completed their assessments, after which both parents failed to complete the treatment recommendations.

The superior court found that "[Damon] only made marginal efforts to comply with his case plan." OCS agrees that things improved once Damon and Kelly

---

[16]     *Christina J.*, 254 P.3d at 1108 (quoting *Maisy W.*, 175 P.3d at 1268).

returned from Michigan, but the record supports the superior court's conclusion that "except for [this] very brief time in May, 2016, neither parent demonstrated any willingness to participate in case plan services." Damon was slow to engage in services, he missed most of his random UA appointments, he admitted to using methamphetamine, he dropped out of outpatient treatment, and he failed to seek residential treatment. He admitted that he did "nothing further on his case plan" even after OCS sought to terminate his parental rights. Given the well-supported findings about OCS's efforts over the life of the case and Damon's own lack of commitment, the gap in services while the parents were living in Michigan was not fatal to an active efforts finding.[17]

Damon also argues that OCS's efforts were not sufficiently active because the agency failed to assist the parents with housing in the Kenai area once they moved back from Michigan and showed a greater commitment to the goals of their case plan. We disagree. In *Christina J.* we rejected the argument that OCS's lack of housing assistance should preclude an active efforts finding when the mother "had rejected available housing options."[18] Here, the superior court did not explicitly address any efforts directed specifically toward stable housing, but it did note that both Damon and Kelly "are homeless and cannot provide for themselves, let alone their children, despite significant and substantial opportunities for housing by the Mission both in Alaska and

---

[17] OCS argues that the "services Damon received [from the Calvary Life Fellowship] on the Michigan farm should count toward ICWA's active efforts requirement." We need not consider this argument, because we conclude that there was sufficient evidence for the superior court to find active efforts based on the life of the case.

[18] *Christina J.*, 254 P.3d at 1109.

Michigan." Homelessness alone cannot disqualify someone from parenting,[19] but a parent's poor housing choices — when there are choices — are relevant. OCS caseworker Klodt testified that Damon and Kelly had stable housing at the Mission after returning from the farm in Michigan. The Mission's associate director testified that Damon and Kelly chose to leave — that they "preferred to . . . be independent," even if that meant living in their car and panhandling. Damon himself testified that he always "walked out" of the Mission despite being encouraged to stay. Given this evidence, OCS's failure to actively assist with housing cannot be fatal to an "active efforts" finding.

Overall, the evidence supports a conclusion that OCS's efforts went beyond merely developing the case plan and leaving Damon on his own to complete it. In light of OCS's efforts over the entirety of the case and Damon's lack of cooperation, we conclude that the superior court did not clearly err in finding that OCS made active efforts to reunite the family.

## V. CONCLUSION

The superior court's order terminating Damon's parental rights to Ian and Janelle is AFFIRMED.

---

[19] AS 47.10.019 ("[T]he court may not find a minor to be a child in need of aid under this chapter solely on the basis that the child's family is poor [or] lacks adequate housing.").