**JUDITH R., Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Appellee.**

**No. S–14693.**

Supreme Court of Alaska.

Dec. 7, 2012.

---

Olena Kalytiak Davis, Anchorage, for Appellant.

Megan R. Webb, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Stephanie Pawlowski, Assistant Public Advocate, and Richard Allen, Public Advocate, Anchorage, for Guardian ad Litem.

Before: FABE, Chief Justice, CARPENETI and STOWERS, Justices.

*OPINION*

STOWERS, Justice.

## I. INTRODUCTION

Judith R. challenges the superior court's order terminating her parental rights to her son, Dexter.[1] The court terminated her rights based on her longstanding, unremedied mental illness. In its ruling on the record, the court, sua sponte, directed the parties to consult with Dexter's therapist

---

1. Pseudonyms are used throughout to protect the privacy of the parties.

about the advisability of allowing continued contact between Judith and Dexter following termination of Judith's parental rights, but the court's written order made no mention of post-termination contact. On appeal, Judith challenges the superior court's finding that termination of her parental rights was in Dexter's best interests and the court's failure to issue a "detailed order regarding post-termination visitation." Because the court's best interests finding was supported by substantial evidence and because the court was not required to address post-termination contact in its termination order, we affirm the superior court's decision.

## II. FACTS AND PROCEEDINGS

### A. Judith

Judith suffers from serious mental health issues that, since 2005, have resulted in Dexter repeatedly being removed from her custody and, ultimately, resulted in termination of her parental rights. Judith does not contest the superior court's findings that her mental illness and emotional disturbance are unremedied and will almost surely continue, that she is unable or unwilling to consistently take medication that has been prescribed to treat her condition, that OCS made active reunification efforts to help her remedy her condition, or that her condition has harmed Dexter and placed him at an ongoing substantial risk of harm. We need not, therefore, discuss Judith's mental health issues or history in detail. But we provide a summary of Judith's condition and examples of her conduct in order to give context to our analysis of the superior court's finding that termination of Judith's parental rights is in Dexter's best interests.

Judith has struggled with mental health, substance abuse, and domestic violence issues for at least ten years. At various times, she has been diagnosed with bipolar disorder, major depression, anxiety disorder, psychotic disorder, and posttraumatic stress disorder, and she has been prescribed a variety of medications, including antipsychotic and antidepressant medicines. She has an extensive history of abusing alcohol, amphetamines, methamphetamine, cocaine, and prescription medications. In the past five years, she has been hospitalized for treatment of mental health issues or received mental health crisis intervention services no fewer than 11 times, and she has been arrested on numerous occasions. In addition, she refuses to end a relationship with a man who physically and mentally abuses her, and she does not appreciate why OCS is concerned about that relationship. Richard Fuller, Ph.D., a neuropsychologist who evaluated Judith in fall 2011, concluded that she cannot function independently without monitoring and support by an agency that oversees the functioning of disabled individuals, and that she will not likely be able to maintain a stable environment for herself or Dexter at any time in the near future.

Dexter has been removed from Judith's custody four times: in 2005, when Judith told police officers and OCS that she was not willing to care for him; in 2006, when she was admitted to a hospital for medical and psychiatric treatment; in 2007, when she left a mental health crisis facility against medical advice; and in 2009, when she became suicidal and was unable to care for her son. Since the final removal, Judith has often exhibited behaviors that are inconsistent with safe parenting. Several examples are illustrative.

In February 2010, police officers responding to a late-night complaint of excessive "banging" in Judith's apartment reported that she was acting strangely and exhibiting extreme mood changes. Judith told the officers that after she ran out of her anxiety medication, her doctor told her to take care of her problems "naturally." She reported that she and her boyfriend, Kirk, had been drinking heavily. The officers issued Judith and Kirk a disorderly conduct warning. Later that night, police returned to the apartment where, although Judith was not at home, the door stood open. Judith then arrived in a taxi, shoeless, and explained that she had been chasing "the love of her life," who had run away from her. Officers transported her to Providence Alaska Medical Center's emergency room, where she told staff that she had been drinking most of the night because drinking calmed her and helped her cope.

In April 2010, Judith was again transported by police to Providence following a disturbance. At the time, Judith, who had been drinking, appeared agitated and confused. She told the officers that she loves police, that she herself was an undercover police officer, and that she was collecting information about bad people. On the way to the hospital, she rambled on about the United Nations, selling cars, living in camps and hotels with an undercover police officer, and her ex-husband's membership in a satanic cult. Judith told staff at Providence that she did not need her psychotropic medications and that she had not taken them for a month.

In April 2011, Judith had the court dissolve a restraining order she had obtained against Kirk, who had twice been arrested for assaulting her, and she resumed her on-again, off-again relationship with him. She told her social worker that she did not understand why OCS would be concerned about their relationship.

In November 2011, a police officer discovered Judith, intoxicated and passed out, on the side of the road. He had difficulty awakening her and then keeping her awake. She did not know where she was. The officer transported her to Community Service Patrol for monitoring.

These are but a few of many examples of such behavior contained in the record.

## B. Dexter

Dexter, who is eight years old, suffered trauma because of Judith's behaviors while he was in her custody and also suffered as a result of repeatedly cycling between Judith's and OCS's custody. After his final removal, his condition deteriorated to the extent that by fall 2011 he had stopped engaging in school, was experiencing intense anxiety, and was having difficulty socializing. In October of that year, he reported fearing that his foster mother, his teacher, and his social worker each intended to hurt or kill him. That same month, he repeatedly physically attacked his foster mother, who had been his caretaker for two years. As a result of his deteriorating mental condition, in December 2011 he was admitted to North Star Hospital for "inpatient psychiatric treatment as a con-

sequence of depressive symptoms, self-injurious behavior, possible psychotic features, and extreme irritability and aggression." He remained hospitalized for a month.

David Sperbeck, Ph.D., conducted Dexter's neuropsychological evaluation. At the termination trial, Dr. Sperbeck described Dexter as being reflective, intelligent, verbal, and articulate. He testified that Dexter showed no signs of brain injury, but was "a very anxious, nervous, self-conscious, sensitive little boy who is very vulnerable and fragile in his emotional functioning." Dr. Sperbeck diagnosed Dexter with dysthymic disorder ("a chronic, low grade depression"), intermittent explosive disorder ("a very bad temper in which he will have explosive, unpredictable outbursts out of proportion to the precipitating events"), generalized anxiety or separation anxiety disorder, and reactive attachment disorder (which "occurs when a child does not develop a good bond with the child's parents, a consistent, loving, predictable relationship with a mother and father"). In addition, Dr. Sperbeck thought that Dexter probably suffered from bipolar disorder, but the doctor was hesitant to confirm that diagnosis because of Dexter's young age.

Dr. Sperbeck testified that children in general do best in a highly structured, predictable environment with clear limits and lots of affirmations and opportunities to be successful, but that Dexter "in particular" needs "a much safer, [more] predictable environment than most children. He is very anxious, he's very nervous about future catastrophe befalling him . . . . [H]e needs a very secure, predictable, consistent environment that has a fixed schedule." Dr. Sperbeck concluded that Dexter was "a very disturbed little boy," whose hypersensitivity and fragility meant that if he were placed in a situation that exposed him to active substance abuse, mental instability, and domestic violence—such as he would likely experience if placed with Judith—he would suffer "significant emotional damage."

## C. Proceedings

In April 2010, OCS petitioned to terminate Judith's parental rights to Dexter. At the

close of the trial, which was held in October and November 2010, the court stated that termination of Judith's parental rights would be in Dexter's best interests, but it denied the petition, concluding that OCS had not provided Judith with sufficient reunification efforts, given the severity of her mental health issues. Dexter remained in OCS's custody while the agency made additional efforts to help Judith remedy her issues.

In January 2012, OCS filed a supplemental petition to terminate Judith's parental rights. The following month, the superior court held another termination trial. The court found on the record, by clear and convincing evidence, that Judith's mental illness and serious emotional disturbance rendered Dexter a child in need of aid, that Judith had not remedied conditions that endangered Dexter, and that OCS's active efforts at reunification had failed primarily because of Judith's "inability to take advantage of what has been offered to her despite the admirable and very detailed and responsive efforts of OCS since October and November of 2010." The court also found, beyond a reasonable doubt, that Dexter would suffer serious emotional damage if Judith's custody of him were to continue. In announcing its decision, the court questioned whether ongoing, post-termination contact with Judith would be in Dexter's best interests, and it instructed the parties to explore that matter with Dexter's therapist and report back to the court in the future.

The court followed its oral ruling with a written order, which, in addition to restating its oral findings, contained a finding, by a preponderance of the evidence, that termination of Judith's parental rights was in Dexter's best interests.[2] The written order did not mention post-termination contact between Judith and Dexter.

## III. STANDARD OF REVIEW

 A trial court's determination that termination of a parent's parental rights is in a child's best interests is a factual finding that we review for clear error.[3] A finding is clearly erroneous if, after reviewing the record in the light most favorable to the prevailing party, we are left with a definite and firm conviction that the trial court was mistaken.[4] We decide de novo whether the trial court's findings satisfy the requirements of the child in need of aid statute.[5]

## IV. DISCUSSION

### A. Termination Of Judith's Parental Rights Was In Dexter's Best Interests.

 Alaska Statute 47.10.088(c) requires a court to consider the best interests of the child in a proceeding involving termination of parental rights under AS 47.10. CINA Rule 18(c)(3) specifies that a court may only terminate parental rights if it finds by a preponderance of the evidence that termination is in the child's best interests.

Judith raises two challenges to the superior court's finding that termination of her parental rights was in Dexter's best interests. First, she claims that the court did not conduct an adequate best interests analysis as part of its oral ruling, and second, she claims that the court relied upon insufficient evidence in making its best interests finding in its written decision.

Judith supports her argument that the trial court erred in its oral ruling by asserting that the court did not specifically address best interests but that instead it "implicitly, inappropriately, and only indirectly" addressed the issue by questioning whether post-termination contact between Judith and Dexter would serve Dexter's interests. Judith errs in interpreting the court's query about post-termination contact as an analysis

---

**2.** This finding is required by Alaska Child in Need of Aid Rule 18(c)(3) before a court may terminate parental rights.

**3.** *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 254 P.3d 1095, 1104 (Alaska 2011).

**4.** *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 175 P.3d 1263, 1267 (Alaska 2008).

**5.** *Carl N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 102 P.3d 932, 935 (Alaska 2004).

of whether termination of Judith's parental rights was in Dexter's best interests. The two matters are distinct questions. The trial court's discussion of the potential for post-termination contact was in no way an analysis of whether Dexter's best interests would be advanced by termination of Judith's parental rights. That best interests analysis was not explicitly performed by the court in its oral ruling on the record, but was performed by the court in its written decision. To the extent that Judith may be arguing that the court erred by including in its written decision a best interests analysis and finding that it had not made orally, her argument is without merit.[6]

As to her second argument, Judith concedes that the court's written order terminating her parental rights contained an explicit best interests finding. In its order, the court specified that this finding was based on evidence recited at length in the portions of its decision addressing Dexter's status as a child in need of aid, OCS's active efforts to reunify the family, and the harm that Dexter would likely suffer if he were returned to Judith's care. That evidence included Judith's long history of mental instability and her failure to follow her doctors' treatment advice; her pattern of repeatedly using OCS as "respite care" for Dexter; her refusal to leave her physically and mentally abusive boyfriend; the trauma her conduct had caused Dexter; Dr. Fuller's testimony that Judith will not be able to function independently without monitoring and support and that she will not be able to maintain a stable environment for herself or Dexter in the near future; and Dr. Sperbeck's testimony

that additional exposure to substance abuse, mental instability, and domestic violence would cause Dexter to suffer significant additional emotional damage. The trial court thus found that termination of Judith's parental rights was in Dexter's best interests, and it explained its finding sufficiently clearly and explicitly to allow for meaningful appellate review.[7]

Judith argues that the court erred in basing its best interests finding on evidence that also supported its other findings. She argues that the court should instead have conducted a best interests analysis independent of "factors ... required for adjudication of either CINA status, active efforts or the likelihood of future serious emotional harm." She asserts that the court should, at a minimum, have taken into account the "best interests" factors set out in AS 47.10.088(b). This argument is unpersuasive.

First, the evidence cited by the trial court clearly relates to whether Dexter's interests lay in terminating his relationship with Judith. Second, while nothing prevents a trial court from considering the factors listed in AS 47.10.088(b) in making a best interests determination under AS 47.10.088(c), the factors listed in subsection (b) are intended specifically to guide a court in determining whether a parent has timely remedied conduct or conditions that endanger a child. As we have noted, a finding that termination of parental rights is in a child's best interests requires a more comprehensive judgment than does determining whether a parent has timely remedied dangerous conduct or conditions.[8]

6. See Sandy B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 216 P.3d 1180, 1187–88 (Alaska 2009) (holding that trial court did not err by following its initial written order terminating parental rights with a second written order that contained findings required for termination that, while implied in the initial order, were not explicitly stated in it); K.T.E. v. State, 689 P.2d 472, 477 (Alaska 1984) ("Generally, where inconsistencies exist between a court's written findings and its oral statements, the written findings control.").

7. See Mapco Express, Inc. v. Faulk, 24 P.3d 531, 537–38 (Alaska 2001).

8. Karrie B. ex rel. Reep v. Catherine J., 181 P.3d 177, 186 (Alaska 2008). In addition, we note that the evidence cited by the superior court addressed all of the factors set out in subsection (b). The first factor concerns the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs. The superior court cited Dr. Fuller's testimony and report, which explicitly addressed that matter, to support its finding. The second factor involves the amount of effort Judith made to remedy the conduct or conditions that placed Dexter in danger. To this end, the court considered Judith's long and cyclical history of engaging in treatment and then relapsing, her failure to follow through with mental health treatment and medication compliance, her failure to comply with

**902**

Finally, Judith argues that the trial court erred by not addressing additional factors relating to Dexter's best interests. Specifically, she asserts that the court should have considered Dexter's recent loss of his long-term foster placement and his current lack of a permanent placement.[9]

■ While trial courts have discretion in determining whether a child's best interests will be promoted by termination of a parent's rights, a child's placement and bond with a foster family are factors that trial courts often consider.[10] In the present case, Dexter had lived with the same foster mother for two years and had bonded with her. OCS had anticipated that, if Dexter were not reunited with Judith, this foster mother would be his permanent caregiver. Shortly before the second termination trial, however, the foster mother lost her job and her home, and could no longer provide care for Dexter. So Dexter was placed with his school counselor, with whom he had a rapport. The placement is not permanent; no permanent placement had been identified for Dexter by the time of the trial.

These circumstances would certainly have been proper for the trial court to have addressed in conducting its best interests analysis. But the court was aware of the situation, having heard testimony about it and explored it with counsel near the close of the trial. That the court chose to exclude Dexter's placement situation from its best interests analysis and instead focus on Judith's

conduct and the consequences that placement with her would have for Dexter indicates the court's belief that, regardless of Dexter's situation, Judith could not be a functional parent for him, and thus severing her parental rights to free him for adoption or another permanent placement would be in his best interests. The court did not err in its analysis.

**B. The Superior Court Did Not Err By Not Addressing Post–Termination Contact In Its Written Termination Decision.**

■ At the close of the termination trial, the superior court speculated, sua sponte, about whether Dexter's interests would be served by continued contact with Judith after her rights were terminated. The court directed the parties to explore this option with Dexter's therapist, and report back to the court. The court specifically reserved judgment on whether it would order post-termination contact, pending further proceedings. Judith argues that the court erred by discussing post-termination contact in its oral ruling but not resolving the matter in its written decision. She asks us to order the superior court to issue "a detailed order regarding post-termination visitation."

■ As with questions of placement, questions regarding post-termination contact between a parent and child are independent of the analysis a court performs in deciding whether to terminate parental rights.[11] In

her OCS case plan, and her failure to separate herself from her abusive boyfriend. The third factor, the harm caused to the child, was addressed by testimony that Judith's actions had caused Dexter to suffer emotional trauma, and by Dr. Sperbeck's diagnosis of Dexter with numerous mental and emotional maladies. The fourth factor, the likelihood that Judith's harmful conduct will continue, was addressed by Dr. Fuller's conclusion that Judith's prospects of being able to parent Dexter were "poor," and by evidence about the cyclical, recurring nature of Judith's behaviors. And the final factor, concerning the history of the conduct or conditions created by Judith, was the subject of all of the evidence referred to by the court.

9. Judith also argues that the trial court should have considered her bond with Dexter, her willingness to keep working toward reunification, and the fact that her presence is the only con-

stant element in Dexter's life. But Judith's assertions as to these matters are not supported by the record.

10. See, e.g., Doe v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 272 P.3d 1014, 1023–24 (Alaska 2012); Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 234 P.3d 1245, 1263–64 (Alaska 2010); Karrie B., 181 P.3d at 184–85; S.H. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs., 42 P.3d 1119, 1124–25 (Alaska 2002); M.W. v. State, Dep't of Health & Soc. Servs., 20 P.3d 1141, 1147 (Alaska 2001); A.H. v. State, Dep't of Health & Soc. Servs., 10 P.3d 1156, 1166 (Alaska 2000).

11. Cf. Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs., 79 P.3d 50, 57 (Alaska 2003) (holding that existence of rela-

its oral ruling at the close of the termination trial, the superior court discussed with counsel both Dexter's placement and post-termination contact. The court was not required to, nor did it, include a ruling on either placement or post-termination contact as part of its order terminating Judith's parental rights. The fact that the court informed the parties that it intended to hear evidence about post-termination contact did not preclude it from finalizing its order terminating Judith's rights in advance of any proceeding that the court might hold in the future concerning post-termination contact. The trial court did not err in this matter.

## V. CONCLUSION

For the foregoing reasons, the superior court's order terminating Judith's parental rights to Dexter is AFFIRMED.

WINFREE, Justice, not participating.

tives with whom a child might have been placed "is unrelated to whether [the parent's] parental rights should have been terminated"); *Erica A. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 66 P.3d 1, 10 (Alaska 2003) (holding that superior court is not required to revisit earlier placement decisions when considering a petition to terminate parental rights).