NOTICE

*Memorandum decisions of this court do not create legal precedent.  A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| TESSA A., | ) |
| | ) Supreme Court No.  S-18524 |
| Appellant, | ) |
| | ) Superior Court Nos. |
| v. | ) 3AN-18-00594/00595CN |
| | ) (Consolidated) |
| STATE OF ALASKA, DEPARTMENT | ) |
| OF FAMILY AND COMMUNITY | ) MEMORANDUM OPINION |
| SERVICES, OFFICE OF | ) AND JUDGMENT* |
| CHILDREN'S SERVICES, | ) |
| | ) No. 1975 – July 5, 2023 |
| Appellee. | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Frank A. Pfiffner, Judge.

Appearances:  Michael L. Horowitz, Law Office of Michael Horowitz, Kingsley, Michigan, for Appellant.  Laura Fox, Senior Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee.  Laura Hartz, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before:  Maassen, Chief Justice, Carney, Borghesan, Henderson, and Pate, Justices.

## I.     INTRODUCTION

A mother appeals the termination of her parental rights to her fraternal twin children, challenging the superior court's reasonable efforts and best interests

---

*        Entered under Alaska Appellate Rule 214.

findings. The mother argues first that the Office of Children's Services' (OCS) efforts were lacking because the family therapist working with the family was not trained to treat the mother's specific mental illnesses, and second, that termination of her parental rights was counter to her son's best interests in light of recent positive interactions she had had with him and given OCS's lack of a definite permanency plan for the son. We see no error in the court's determination of reasonable efforts or clear error in the court's best interests findings, and we therefore affirm the court's termination of the mother's parental rights.

## II. FACTS AND PROCEEDINGS

### A. Family History

Tessa is the mother of twins, Ava and Ari, who were born in 2011.[1] Their father has not been involved in their lives.[2] Tessa has mental health conditions, including a schizotypal personality disorder and an unspecified psychotic disorder. The twins have significant medical and behavioral health needs. Ava has a genetic form of rickets and has required medication and leg braces to treat the condition. Ari has significant behavioral health issues and was diagnosed with Oppositional Defiant Disorder and Attention Deficit/Hyperactivity Disorder in 2018. Both twins have Individualized Education Programs due to early childhood developmental delays.

### B. Initial OCS Involvement And Removal

Between April and early October 2018, the children's school sent five reports to OCS after Ari reported that his mother hit him, either with various household objects or with her hands. After the fifth report, OCS investigated and interviewed

---

[1] We use pseudonyms to protect the parties' privacy.

[2] The children's father relinquished his parental rights in advance of the second termination trial, after OCS had made repeated efforts to contact him and provide him services.

Tessa at home. OCS referred Tessa to services to help with the children's behavioral issues and offered to help Tessa enroll the children in services, which she declined.

OCS received two more reports in late October that described further incidents of physical abuse. In response OCS took Ava and Ari to a child advocacy center for interviews and examinations, where both children reported physical abuse. OCS then filed a non-emergency petition for adjudication. After efforts to create a safety plan failed and Ari reported further physical abuse, OCS removed the children in January 2019.

The children were placed in separate therapeutic foster homes due to Ari's behavioral issues. Both children were enrolled in wraparound services as a part of their therapeutic foster home placement through AK Child and Family.[3] As a part of these services, the children started seeing a therapist. Both children were diagnosed with post-traumatic stress disorder (PTSD) and a history of neglect, psychological abuse, and physical abuse. In therapy the children made reports of abuse consistent with their prior disclosures.

OCS arranged a number of services for Tessa following removal. Weekly visitation with the children began at once. Tessa engaged with the recommended parenting services through April 2019 and completed a parenting class that summer. Tessa also had an initial mental health assessment in May 2019, which found that she needed further assessment for psychosis and schizophrenia, especially considering her previous diagnosis of schizophrenia and reported hallucinations. The assessor also recommended individual counseling.

---

[3] These wraparound services included a licensed therapist, an activity therapist to visit them at school, and placement with a specially licensed therapeutic foster parent, all coordinated by a care management team.

**C.    OCS's Efforts Toward Tessa And The Twins, Including Family Therapy And Mental Health Treatment**

Throughout 2019 the children worked with their therapist and made progress in their communication, conflict resolution, emotional regulation, and relationship with one another. This progress was especially apparent in Ari. In November 2019 the children's relationship stabilized enough that OCS began the process of placing them in the same therapeutic foster home, beginning sometime in early 2020.

Tessa consistently attended weekly supervised visitation. At visitation Tessa would primarily interact with Ava, not Ari — if she interacted with the children at all. There were also several incidents during visitation when Tessa behaved aggressively with the children. The children's school counselor noticed that Ari's behavior deteriorated after visits with his mother, despite the fact that the children's behavior and mood had generally improved after removal.

Tessa initially engaged in family therapy with the children and their therapist, but her engagement was brief and intermittent. When she attended appointments, she struggled to focus on the therapist's direction for the session. Tessa did not acknowledge her physical abuse of the children, refused to discuss it in family therapy, and blamed other people for the family's problems.

Following an incident in early March 2020, Tessa stopped participating in family therapy. According to the children's therapist, Tessa grabbed Ari's arm during an argument between the two children about playing with Legos. This caused Ari to have a "freeze response" and led to him running outside of the therapist's office. Afterward, the therapist tried to give Tessa feedback, which upset her, and Tessa left the office. The therapist called Tessa to debrief and attempted to resume family therapy with her, but Tessa refused.

OCS referred Tessa for a second mental health evaluation in December 2019 with another provider. That evaluator diagnosed her with schizotypal personality

disorder and recommended that she follow up with psychiatric counseling and medication. Tessa engaged in therapy with that provider, but her attendance was sporadic and inconsistent despite OCS's provision of bus passes to help her get to and from appointments.

In October 2020 Tessa switched to a new mental health provider. According to Tessa, the new provider was a better fit for her needs. At some point after beginning individual therapy with the new provider, Tessa learned they could also provide family therapy for her and the children. Despite Tessa's preference for the new provider, she continued to participate in individual therapy only sporadically.

### D. First Termination Trial

OCS filed a termination petition in September 2020, and the trial was held in May and June 2021. During that trial, the court heard testimony from the children's school counselor, the four OCS caseworkers who had been assigned to the case, and an OCS visitation supervisor. Tessa testified about her experiences with OCS, including that she had asked OCS about pursuing family therapy with her new provider because she wanted to continue family therapy, but did not trust the children's provider. She further testified that she did not trust the current caseworker because he focused on her mental illness instead of helping her address other issues. Tessa also gave her explanation for what had occurred at family therapy: she grabbed Ari to "prevent him from hitting his head."

The superior court denied the termination petition, holding that OCS had failed to meet its burden of proof in several respects, including that there was clear and convincing evidence only that Ari had been subject to physical abuse.[4] The court found OCS's evidence of reasonable efforts to be lacking,[5] noting that it was unclear which services OCS had recommended to Tessa and that OCS had not worked to reduce

---

[4] AS 47.10.088(a)-(c); AS 47.10.011(6).

[5] AS 47.10.086(a).

Tessa's distrust of the system or of individual workers. Despite these findings, the court found that the children remained in need of aid and that returning to the custody of their mother at that time would be contrary to their welfare.

### E.    Continued Reunification Efforts After The First Trial

#### 1.    Services to Tessa

OCS continued efforts to provide services to Tessa. At Tessa's request the caseworker investigated Tessa's preferred mental health provider as an option for family therapy in late November 2021. Both Tessa's provider and the children's current therapist explained that the children would not be able to participate in family therapy with the new provider without ceasing individual therapy at AK Child and Family. Additionally, if Ava switched therapists, her therapeutic foster placement would also have to change. In consultation with the guardian ad litem, the caseworker ultimately decided not to pursue a change in therapy providers, to avoid disrupting the children's therapeutic progress.

Tessa continued therapy with her preferred provider for several months after the first termination trial. Her participation in treatment there remained inconsistent, and in March 2022 Tessa was discharged for nonparticipation.[6]

After a challenging meeting with her caseworker in December 2021, Tessa refused to engage any further with OCS. Tessa and the caseworker reported different versions of the events that took place. The caseworker reported that he ended the meeting early because he felt unsafe after Tessa started punching her palm with her fist and she had to be escorted out of the building by security. Tessa denied that she made any gestures or that security was involved, but admitted to raising her voice. Tessa testified that she was frustrated by what she perceived as the caseworker's

---

[6]    Tessa testified later that she had restarted therapy on June 15, 2022, but the records only show that she cancelled an appointment earlier that month.

inappropriate focus on termination. Tessa refused to meet with OCS thereafter, despite OCS's repeated efforts to meet with her and her attorney.

**2.      Visitation and the children's continued mental health struggles**

After an interruption due to the COVID-19 pandemic, visitation resumed in August 2021. Before the first visit, Ari had a significant, aggressive behavioral incident because he did not want to attend visitation with his mother. This incident was consistent with the trend of Ari's violent and aggressive behavior escalating after visitation. And in September and October Ari's behavior deteriorated further. He often took his anger out on his sister, including homicidal ideation towards her, and at one point he ran away from his foster home and into traffic. As a result Ari was admitted to North Star Behavioral Health, where he remained for three months before returning to therapeutic foster care.

In March 2022 Ari was readmitted to North Star after further incidents of aggression, running away, and self-harm, and he remained in residential psychiatric care throughout the remainder of the case. He was released to a residential treatment center for a few months, but was readmitted to North Star after he resumed walking into oncoming traffic and other aggressive and harmful behaviors. North Star eventually located a facility in Florida that would be able to provide him appropriate longer-term treatment.

Ari had phone contact with his mother while at North Star. Tessa reported that, during those calls, she would try to help Ari and the phone calls were largely positive.

Ava did well in therapeutic foster care; she performed better in school and her rickets improved such that she no longer wore leg braces. But Ava remained very fearful of her mother. At one point very late in the case, she drew pictures of Tessa threatening Ari with a stick, captioned: "You are next too!" And in summer 2021 Ava suffered from flashbacks of the abuse after seeing her mother in a grocery store. Soon

after this incident, OCS ceased Tessa's visitation with Ava, because it was no longer therapeutically recommended.

By August 2022 the children's maternal aunt in Louisiana had agreed to adopt the twins. Ava spoke with her aunt on the phone several times per week and expressed that she loved talking to her. The aunt was aware of Ari's significant behavioral needs and was willing to participate in his treatment until he could safely be placed in her home.

### F.    Second Termination Trial

In January 2022 OCS filed a second termination petition. At the second termination trial in August 2022, the court heard from the family's most recent OCS caseworker, Ava's current and Ari's former foster parent, the children's therapist, and Tessa. The caseworker testified about his perception that Tessa had made no efforts to change her behavior, his difficulties in providing services to her, and attempts to continue to provide services after the challenging meeting in December 2021.

Tessa testified that working with OCS was challenging because of what she perceived as its inappropriate focus on termination. She testified that she generally distrusted most mental health providers, with the notable exception of her most recent provider. She explained that she did not trust the children's therapist in particular.

The children's therapist testified about her involvement with the family, including the treatment she provided and the children's consistent and repeated disclosures of physical abuse. She outlined her qualifications as a licensed clinical social worker with about six years of experience in providing individual and family therapy to children and families. The therapist also explained that she was trained in diagnosing and counseling patients with a wide variety of psychiatric disorders, but she was not qualified to diagnose or treat patients with schizotypal personality disorders and she was not aware of Tessa's diagnoses. But she noted she would have been willing to work with Tessa's individual therapist on joint family therapy if there had been a release of information.

During closing arguments Ari's attorney expressed that his clear preference was to be placed with his aunt or in another family-type setting after his treatment is complete. Noting that Ari would not understand the legal terminology, Ari's attorney stated that his preferences meant that he was ultimately in favor of termination.

### G. Superior Court's Findings

The superior court granted the second termination petition in August 2022. The court found by clear and convincing evidence that the children were in need of aid due to Tessa's failure to provide for their necessary medical and mental health treatment, physical abuse, neglect, and Tessa's untreated mental illness.[7] The court also found that Tessa failed to remedy the conditions that placed the children at risk of substantial harm, emphasizing Tessa's failure to consistently engage in mental health treatment.

The court found that OCS made reasonable reunification efforts. It noted that the most recent OCS caseworker was consistently engaged and trying to get Tessa involved in services. Describing Tessa's "my-way-or-the-highway" approach, the court noted that Tessa stopped working with OCS when it did not do precisely as she wanted. The court also noted that OCS's efforts need not be perfect, only reasonable.

The court found that it was in both Ava and Ari's best interests to terminate Tessa's parental rights. The court relied on the children's intense anxiety and PTSD related to their mother and their overall need for permanency. The court found that, despite the uncertainty in Ari's future, he would benefit from the knowledge that after treatment he had a potential permanent home with his aunt.

Tessa appeals.

---

[7] *See* AS 47.10.011(4), (6), (9), (11).

## III. STANDARD OF REVIEW

"Whether OCS made reasonable efforts to reunify the family is a mixed question of law and fact. For mixed questions, we review factual issues under the clearly erroneous standard and legal questions using our independent judgment."[8] Whether termination of parental rights is in a child's best interests is a factual determination that we review for clear error.[9] "Factual findings are clearly erroneous if a review of the entire record in the light most favorable to the prevailing party leaves us with a definite and firm conviction that a mistake has been made."[10] But "[c]onflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[11]

## IV. DISCUSSION

### A. The Superior Court Did Not Err When It Determined That OCS Made Reasonable Efforts, Even Though The Family Therapist Was Not Qualified To Treat Tessa's Mental Illness.

Tessa first challenges the superior court's conclusion that OCS made reasonable efforts, arguing that family therapy failed because OCS did not provide a family therapist trained in treating Tessa's mental illnesses. Tessa contends that this rendered all of OCS's efforts unreasonable. We disagree.

---

[8] *Kylie L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 407 P.3d 442, 448 (Alaska 2017) (quoting *Joy B. v. State, Dep't of Health & Soc. Servs., Office of Child.'s Servs.*, 382 P.3d 1154, 1162 (Alaska 2016)).

[9] *Dena M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 442 P.3d 755, 760 (Alaska 2019).

[10] *Marcia V. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 201 P.3d 496, 502 (Alaska 2009).

[11] *Charles S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 442 P.3d 780, 788 (Alaska 2019) (alteration in original) (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Off. Of Child.'s Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)).

When terminating parental rights, the court must determine by clear and convincing evidence that OCS made "timely, reasonable efforts . . . to enable the safe return of the child to the family home."[12]  In particular OCS must have identified the services that would assist the parent in remedying the conduct causing the children to be in need of aid and referred the parent to those services.[13]  OCS "has some discretion in determining what efforts to pursue and whether the timing is reasonable,"[14] but "must provide a parent with a 'reasonable opportunity' " to remedy the behavior.[15]  In making these determinations, "the primary consideration is the child's best interests."[16]

We evaluate OCS's efforts "in light of the circumstances of each particular case."[17]  A failure to provide a specific referral or to provide reasonable services for a short period of time does not foreclose finding reasonable efforts when viewed in their entirety.[18]  The parent's participation in services is also a relevant consideration.[19]  In all, "[t]he efforts that OCS makes must be reasonable but need not be perfect."[20]

---

[12]     AS 47.10.086(a).

[13]     AS 47.10.086(a)(1)-(2).

[14]     *Sean B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 251 P.3d 330, 338 (Alaska 2011).

[15]     *Burke P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 162 P.3d 1239, 1244-45 (Alaska 2007) (quoting *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Fam. and Youth Servs.*, 77 P.3d 715, 720 (Alaska 2003)).

[16]     AS 47.10.086(f).

[17]     *Audrey H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 188 P.3d 668, 678 (Alaska 2008).

[18]     *Casey K. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 311 P.3d 637, 646 (Alaska 2013).

[19]     *Joy B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 382 P.3d 1154, 1166 (Alaska 2016).

[20]     *Audrey H.*, 188 P.3d at 678.

Here, OCS's efforts toward Tessa and the family were not without flaws, but they were reasonable as a whole, in light of the totality of the circumstances. The superior court found that OCS referred Tessa to a multitude of services. Before the children were removed, OCS repeatedly attempted to work with Tessa over the course of months to create an in-home safety plan and referred Tessa and the family to various services. But Tessa did not follow up with the recommended services and refused to name any potential participants in a safety plan.

After the children were removed, OCS referred Tessa to parenting support and classes, family therapy, multiple mental health assessments, and individual therapy; offered transportation; scheduled and attempted case planning meetings; and facilitated family contact. The court also found that Tessa had a "my-way-or-the-highway" attitude, meaning she tended to disengage when things did not go her way. This behavior made it challenging for OCS to case-plan and provide services. Despite Tessa's attitude and unproductive case planning meetings, OCS continued to attempt to work with her and provide services.

In addition to offering services to Tessa, the superior court found that OCS made efforts toward the entire family. OCS attempted on many occasions to contact the children's father and provide him with services. Additionally, OCS found therapeutic foster homes for the children, provided individual therapy for both children, arranged necessary medical care for Ava, worked to place the children together when possible, and identified a permanent placement with the children's aunt out of state. Tessa does not challenge the superior court's factual findings on these points, and we note they are well supported by the record.

Turning to Tessa's specific challenge to the qualifications of the family therapist, we decline to rule that the reasonable efforts standard in this context requires that the family therapist, one member of a family's multi-person treatment team, be trained to treat each family member's diagnoses. Although it may have been more ideal for the family therapist to be experienced in treating Tessa's specific mental illness, the

focus of family therapy was not on treating Tessa's individual disorders, but on repairing Tessa's relationship with her children and helping her to understand their needs. It is not clear that another family therapist would have been able to overcome Tessa's inability to acknowledge her abuse of the children or the harm she had done, even with training to treat her individual condition.

Additionally, OCS referred Tessa to individual therapy related to her individual conditions. Had Tessa regularly engaged, this individual therapy may have helped Tessa regulate her own emotions and better engage in family therapy. But Tessa's participation in her individual therapy was inconsistent. Even with her chosen provider, she only attended 12 appointments in a year, and that therapist noted that Tessa "struggled to engage in mental health treatment." Eventually she was discharged from that mental health treatment for nonparticipation. OCS also referred Tessa to other services, such as parenting classes and parent navigation services, that may have helped her build necessary skills. But she participated in those services for only a short period of time before disengaging altogether.

We further note that OCS did consider the possibility of moving family therapy to Tessa's chosen mental health provider, in order to provide the service with a family therapist Tessa trusted and who was also trained in treating Tessa's individual diagnoses. But OCS decided against changing family therapists because it would not have been in the children's best interests. Tessa's provider explained that the children would not be able to conduct family therapy there without ceasing family therapy at AK Child and Family. The children's therapist confirmed that the children would likely have to switch providers to ensure that all the therapists were working on the same goals.

Both children, but especially Ava, had developed relationships of trust with their therapist and had made progress in their emotional regulation and their relationship with each other. The children's therapist testified that changing providers could lead Ava to "regress" if it was not carefully managed. Additionally, if Ava

-13- *1975*

switched therapists, her therapeutic foster placement would also have to change because her foster mother was licensed through AK Child and Family. Ava had grown to trust her foster mother, and her physical and mental health had improved in her foster mother's care.

Given the significant disruptions that would accompany starting family therapy with a new provider, OCS decided against the change. Where the *primary* consideration in evaluating and making reunification efforts is the best interests of the children,[21] OCS could reasonably prioritize consistency in the children's providers over Tessa's desire for a more specialized family therapist.

Ultimately OCS offered the family myriad services aimed at ameliorating safety risks to the children and reuniting the family. Tessa's perception of a failure in family therapy does not undermine the quality of OCS's efforts as a whole. We therefore affirm the superior court's determination that OCS made reasonable efforts to reunite this family.

### B. The Superior Court Did Not Clearly Err In Finding That Termination Was In Ari's Best Interests.

Tessa additionally challenges the superior court's finding that termination was in Ari's best interests.[22] She argues that because she had recently had positive interactions with Ari and because OCS lacked a definitive permanency plan for him, it was not in his best interests for her parental rights to be terminated. Considering Ari's preference against reunification, Tessa's failure to remedy or even recognize her physical abuse of Ari, and the superior court's thorough consideration of the uncertainty in Ari's future, we conclude that the superior court did not clearly err in finding that termination of Tessa's parental rights served Ari's best interests.

---

[21] AS 47.10.086(f).

[22] Tessa does not challenge the best interests finding with respect to Ava.

When terminating parental rights, OCS must prove by a preponderance of the evidence that termination is in the best interests of the child.[23] "[T]he trial court may consider any fact relating to the best interests of the child," including but not limited to those listed in AS 47.10.088(b) regarding whether a parent has remedied their harmful conduct.[24] "The factors listed in the statute are not exclusive, and the trial court need not accord a particular weight to any given factor."[25] The best interests analysis is "capacious," requiring "a comprehensive judgment as to whether the child's best interests favor the termination of parental rights."[26]

Tessa points to two factors that she contends are decisive here: her recent positive bond with Ari and uncertainty surrounding Ari's permanency plan. Both are appropriate considerations in examining Ari's best interests, but they are not dispositive. While a positive relationship between a parent and child may indicate it is not in a child's best interests to terminate parental rights,[27] that factor in itself is not necessarily decisive where other factors, such as the parent's failure to remedy their conduct, may outweigh the parent-child bond.[28] Additionally, "the lack of a pre-adoptive placement . . . may be relevant to a best-interests finding," but "it does not preclude the court from finding that termination of parental rights is in the children's

---

[23] AS 47.10.088(c); CINA Rule 18(c)(3).

[24] *Shirley M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 342 P.3d 1233, 1243 (Alaska 2015).

[25] *Id.*; *see also Judith R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 289 P.3d 896, 901 (Alaska 2012).

[26] *Karrie B. ex rel. Reep v. Catherine J.*, 181 P.3d 177, 186-87 (Alaska 2008).

[27] *Id.* at 187.

[28] *Joy B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 382 P.3d 1154, 1166-67 (Alaska 2016).

best interest[s]."[29]  Even in cases where permanency is uncertain, the superior court may find that termination is acceptable in achieving the child's best interests, especially considering a parent's potential inability to remedy the conduct.[30]  Both factors are parts of a holistic analysis of what is in the child's best interests.[31]

Tessa first argues that the superior court failed to consider the positive influence of her recent phone calls with Ari.  As an initial matter, it is not clear from the record that the recent phone calls were positive for Ari.  Tessa testified that she called Ari at North Star several days per week and that the interactions were positive, but none of Ari's providers testified about how those calls impacted Ari.  Previously, Ari's behavior significantly regressed after contact with his mother.  These regressions included homicidal and suicidal ideation, threatening Ava, and running into traffic and endangering himself.  Apart from Tessa's description of her recent phone calls with Ari, nothing in the record indicates he did not regress after those calls.

Even assuming that the recent contact was positive, the record shows that Ari did not want to be reunified with his mother.  And after four years, Tessa had not made meaningful improvements in her mental health, and she refused to acknowledge the harm she had caused her children.  That the superior court did not explicitly reference Tessa's claims of recent positive contact with Ari does not render its overall best interests findings clearly erroneous.

Moreover, the superior court acknowledged and carefully considered the uncertainty that may lie ahead for Ari, but ultimately decided termination of Tessa's rights was in his best interests.  As the court noted, at the time of the termination trial, OCS had identified a positive prospect for permanency for Ari.  Following further

---

[29]     *Doe v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 272 P.3d 1014, 1024 (Alaska 2012) (alteration in original); *Karrie B.*, 181 P.3d at 185.

[30]     *Judith R.*, 289 P.3d at 902.

[31]     *Doe*, 272 P.3d at 1024-25.

behavioral health treatment, OCS planned to place Ari with his maternal aunt, who had built a positive relationship with and sought to adopt Ava, and who sought to be Ari's permanent placement as well. Ari's permanency plan was understandably uncertain given the nature of his behavioral health needs. But the court found that that uncertainty was outweighed by the benefits of termination, including the certainty for Ari that he would not return to Tessa and the hope of permanent placement with his aunt. These findings are not clearly erroneous.

## V. CONCLUSION

We AFFIRM the superior court's order terminating Tessa's parental rights.